IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HEATHER E. WEISS,                    )
                                     )
            Plaintiff,               )
                                     )        No.  07 CV 6771
      v.                             )
                                     )        Hon. Michael T. Mason
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
            Defendant.               )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Heather Elizabeth Weiss ("Weiss" or "claimant") filed a motion for

summary judgment seeking judicial review of the final decision of the Commissioner of

Social Security (the "Commissioner") denying her claim for disability insurance benefits

under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(I) and 423(d).  The

Commissioner filed a cross-motion for summary judgment asking this Court to uphold

the decision of the Administrative Law Judge ("ALJ").  We heard oral arguments on

those motions on March 4, 2009.  After carefully reviewing the parties' briefs and the

statements of their counsel during oral arguments, the Commissioner's motion for

summary judgment is granted and Weiss's motion for summary judgment is denied for

the reasons set forth below.

**I.      PROCEDURAL HISTORY**

Claimant filed an application for disability insurance benefits on September 12,

2003.  (R. 125-28).  In that applicant, Weiss alleged a disabling condition of "bipolar,"

depression, anxiety, "tremors in hands from meds[,] stomach upset from meds," and

night sweats" that has precluded her from working since May 1, 2003. (R. 125-28).[1] Claimant subsequently stated that she became unable to work because of a disabling condition on January 1, 1999. (R. 136). Accordingly, the Social Security Administration considered claimant's application based on an alleged onset date of January 1, 1999, and date last insured of June 30, 2003. (R. 20, 97).

The administration denied claimant's application initially, and again upon reconsideration. (R. 97-98). Claimant filed a timely request for an administrative hearing. (R. 114). On December 13, 2006, claimant appeared with counsel at an administrative hearing before Administrative Law Judge Dennis Greene ("ALJ Greene"). (R. 42-96). In a decision dated February 14, 2007, ALJ Greene found that claimant was not disabled under the Act. (R. 20-28). On October 4, 2007, the Appeals Council declined claimant's request for review, and ALJ Greene's opinion became the final decision of the Commissioner. (R. 8-10); *Zurawski v. Halter,* 245 F.3d 881, 883 (7th Cir. 2001).

## II.    BACKGROUND

### A.    Claimant's Testimony

Weiss testified at the December 13, 2006 hearing. (R. 47-72, 90). Claimant, who was born September 4, 1978, was 28 years old at the time of the hearing. (R. 47). According to claimant, her disability is primarily due to "really bad migraines." (R. 59). She testified that she also suffers from "[b]ipoloar [disorder] but that's not so much. It's

---

[1]Claimant also filed an application for child's insurance benefits on account of her deceased father, John A. Weiss, on December 27, 2004. (R. 751-54). That application is not before this Court.

the migraines that are stopping [her]." (*Id.*).

Weiss stated that her migraine headaches usually occur about a month after her "treatments" or "ultra compulsive therapy."[2] (R. 63). According to claimant, her doctor suggested the therapy treatments "because of how depressed [she] was." (R. 64). The headaches are also triggered by MSG's in food, fluorescent lights, stress and the weather, specifically rain and the "pressure in the air." (R. 64-65). Claimant's headaches are proceeded by blurred vision and accompanied by white spots in one eye. (R. 66). She also "starts getting really hot." (*Id.*). The headaches are usually in one particular spot, behind claimant's eye. (R. 65). During her headaches, claimant cannot see out of the eye on "[t]he side that it's on" because "[i]t's real fuzzy and there's like all these white spots." (R. 66-67). Further, movement causes her to become nauseous. (R. 66.). Weiss usually lays in the closet "because its cold" and "really dark and it's like the best thing." (*Id.*). Claimant's headaches occur two to three times a week and generally last for six to sixteen hours. (R. 66). Her longest headache lasted for three days. (R. 65-66). When she feels a headache "coming on" she'll take a shot of Imitrex "so it doesn't get worse." (R. 66). Claimant previously took Topomax for her migraines, which "worked for a while and then it just stopped." (R. 67). Her doctor also prescribed a nasal spray but Weiss "wasn't too keen on that." (R. 68).

Weiss started seeing a psychiatrist when she was seventeen years old. (R. 60). "[A]t that time, they thought [she was] a manic or severe depressive, [with] depression, and a lot of anger." (*Id.*). Weiss has difficulty with anger and, as a teenager, attacked

---

[2]Based on the medical records, it appears that claimant is testifying about her electroconvulsive therapy ("ECT") treatments.

her mother "pretty hard try to, doing a lot of things to her." (*Id.*). When asked about her suicide attempts, Weiss stated that she "can't really recall the first time," but "can recall the last time." (R. 62). In her most recent attempt, claimant "turned the car on" inside the garage. (R. 63). She previously tried hanging herself with a belt. (*Id.*). In connection with the discussion of her suicide attempts, claimant stated that she was raped while living in Georgia. (*Id.*).

Claimant suffers from depression "[o]nce in a while." (R. 70). When this happens, she "just get[s] down . . . [does]n't want to do any thing . . . [and] would rather stay in bed all day." (R. 70). Weiss has discovered certain "triggers" for her depression, mainly that she stays in bed too much, doesn't want to eat or "never want[s] to stop eating." (R. 70). She takes Zoloft, which helps with the depression. (*Id.*). Claimant took Lithium for a while, but "wasn't getting the [e]ffects . . . needed and the headaches were bad." (R. 64). Weiss also has periods where "[e]verything is great," she wants to "do tons of things," and doesn't sleep "at all." (R. 71). Claimant testified that she goes "from one extreme to another." (*Id.*).

Weiss has never been married, and does not have any children. (R. 47). At the time of the hearing, she lived with her mother and stepfather. (R. 58). She has lived with them for the past three years. (*Id.*). On a typical day, she "tr[ies] to clean" and spends a lot of time playing with her dog. (R. 70-71). When claimant was a teenager, she received a $800,000 trust fund upon the death of her father. (R. 61-62). Weiss testified that she "bought a lot expensive gifts for people, cars . . . [her] house and then lost it when [she] couldn't work anymore." (R. 62).

According to her testimony, Weiss was "[o]ne credit away from graduating" from

high school.  (R. 47).  She initially attended "regular classes," and transferred to a private school at the end of her sophomore year.  (R. 90).  Claimant described this school as "only three hours a day.  It's a lot less time and you do everything on computers."  (*Id.*).  Claimant went to cosmetology school for about two months in Georgia.  (R. 69).  She also received less than one month's training as a veterinarian's assistant.  (R. 48).

At the time of the hearing, claimant last worked as a babysitter.  (R. 48).  She watched two children, ages six and seven, from 7:00 a.m. to 5:00 p.m. in the summer, and before school and from 2:45 p.m. to 5:00 p.m. during the school year.  (*Id.*).  Claimant would take the children to and from school "most of the time," play games with them, and help them with their homework.  (*Id.*).  She also took the children to the zoo "a few times" and to the pool in the summer, and "[t]ried to go for bike rides."  (*Id.*).  Approximately once every other week, the children's mother would come home because claimant "couldn't take care of them anymore."  (R. 68).  The babysitting job lasted eight months and ended a few weeks before the hearing when the family "moved away."  (R. 48-49).  Prior to that, in 2005, claimant volunteered at an animal hospital, helping the animals in the recovery room.  (R. 51).  This involved monitoring the animals' breathing, providing food and water, cleaning up their dressings, administering medications, and taking them on walks.  (R. 52).  Claimant also worked as a "vet tech" for a few months, working six to twelve hours per day.  (*Id.*).  From approximately September 2003 to July 2004, Weiss worked as an independent cyclist for a courier service.  (R. 50).  She testified that the courier service transitioned her from full to part time because she was "missing maybe two to three days a week" due to her migraines.  (R. 68).

At age fifteen, Weiss began working for her stepfather's painting business for two days a week. (R. 52). She stopped working there approximately a year and a half before the hearing, although "[s]ometimes he still . . . asked if [she] can help out." (R. 53). Weiss testified that she has not "helped out" in over a year. (*Id.*). Her job with the painting business involved removing old wallpaper, cleaning up, and a "little bit" of painting. (R. 57). Weiss picked up buckets of paint, but did not work on scaffolding or ladders. (*Id.*). Her stepfather paid her in cash. (R. 53). Claimant also worked as a teacher's aide, bartender, waitress, receptionist, and driver for a dry-cleaning service. (R. 50-51). She testified that she was not currently working, and that her mother has been supporting her. (R. 58).

### B. Carol Weiss's Testimony

Claimant's mother Carol Weiss ("Carol") testified at the hearing before ALJ Greene. (R. 72-77). Carol stated that her daughter has lived with her "on and off," and most recently for the past "year, year and a half." (R. 72). Prior to that, Weiss had a house about "five minutes away" from her mother's home, and then rented a few places. (*Id.*). According to Carol, claimant lost her home to foreclosure after entering into a contract without her mother's knowledge. (R. 72-73). Carol testified that Weiss has been "[p]retty much" on her own since age eighteen, but had the trust fund and "was always taking, needing money from mom, too." (R. 73). She further testified that Weiss worked for her husband, but "only [for] a couple of months . . . a couple years ago." (R. 74).

Carol first noticed that her daughter had "problems" when Weiss was in junior high. (R. 75). "[A]t the time [Carol] thought they were just temper tantrums, but [found]

6

out later that it had to do with the depression. And she would get very violent and that was part of the bipolar." (*Id.*). When claimant was seventeen, her mother placed her in an outpatient program for treatment. (R. 75-76). Carol could not determine if claimant improved "because [she] couldn't tell if it was acting or if she was getting improvement." (R. 76). Carol recalled that Weiss "would go into lapses where the depression was bad and then they would put her in the hospital." (*Id.*). Subsequently, her doctor decided to try "ECT treatments." (*Id.*). After the ECT treatments, Carol "really thought [Weiss] was on the right road to getting a job, being able to handle it and then she started with having the headaches, the migraines." (*Id.*).

According to Carol, claimant currently "doesn't do much." (R. 76). "Day to day she can, some days she's good, she'll do laundry. And then the next day she comes up with a migraine and [is] calling me to take her to the hospital or she can't cope with it." (R. 76-77). Carol believes that her daughter's prescription for Imitrex "helps at times." (R. 77). She stated that Weiss used marijuana for "therapeutic reasons" because it "would help her when she had the migraine and she would be vomiting." (R. 74).

### C.    Medical Evidence

Claimant submitted various medical records in support of her claim for benefits. (R. 285-735). The earliest of those records memorialize claimant's visit to Donald Fagerson, M.D. ("Dr. Fagerson"), her treating psychiatrist, on October 14, 1996. (R. 470).[3]   According to Dr. Fagerson, claimant sought treatment for "fights [with] her

---

[3]This Court has carefully reviewed claimant's medical records and, to the extent possible, identified the relevant findings and opinions set forth therein. However, we encountered significant difficulties deciphering Dr. Fagerson's handwriting. Because his progress notes are partially illegible, it is possible that certain relevant facts, not mentioned in

mother - especially bad [for the] past four months." (*Id.*). Weiss denied a depressive mood, but reported irritability, crying spells, and problems sleeping. (*Id.*). Claimant returned for treatment on December 16, 1996, at which time Dr. Fagerson increased her prescription for Zoloft to 75 mg. (R. 469). On February 18, 1997, Dr. Fagerson refilled claimant's prescription for "Zoloft 50 mg #45." (R. 468). Claimant continued to see Dr. Fagerson once a month through May 31, 1997, and every other month through June 16, 1998. (R. 465-68). During that time, Dr. Fagerson routinely prescribed 100 mg of Zoloft. (*Id.*). Following her June 16, 1998 appointment, claimant did not seek treatment from Dr. Fagerson until December 21, 1998. (R. 464). Dr. Fagerson's progress notes indicate that after that date, he continued to treat claimant for depression and anger problems every two to seven months through March 12, 2002. (R. 246-47, 452, 456-64).

On April 4, 2000, claimant voluntarily admitted herself to Linden Oaks Hospital ("Linden"). (R. 294-95). According to the intake assessment, Weiss previously received treatment at Linden and returned because "the thoughts of suicide are really back and bad." (R. 294). Claimant reported that she was "very scared" to be by herself "because of what [she] might do." (*Id.*). The individual who completed the intake assessment noted that Weiss had a "flat affect, depressed mood, very low speech, little eye contact, no make-up, hair not done." (R. 295).

While receiving treatment at Linden, claimant reported an inability to sleep and poor appetite for the past month. (R. 296). Weiss also reported "self mutilation, cuts

the parties' briefing or otherwise discernable to this Court, have been omitted from this Opinion.

8

[with] knife - last time 2 weeks ago." (*Id.*). She denied any homicidal ideation and stated that she was not taking any medication as it was not "needed." (*Id.*). An attending physician diagnosed Weiss with depression and suicidal ideation. (R. 299). Claimant participated in individual and group therapy. (R. 293). Weiss's treatment goals included an improved mood and better coping skills. (*Id.*). Claimant was discharged on or around April 21, 2000. (R. 289). The discharge summary indicates that Weiss was "not compliant" with treatment and medications. (*Id.*).

Weiss received treatment through the adult partial hospitalization unit at Alexian Brothers Behavioral Health Hospital ("Alexian") from June 6 through 8, 2000. (R. 304-15). During her treatment, Weiss reported increased depression over the past three to four weeks, mood swings, and night sweats. (R. 306). On June 7, 2000, Kelton Reitz, D.O. ("Dr. Reitz") completed a medical history and physical consultation. (R. 314-15). The doctor noted that Weiss "presented with suicide attempt over relationship with her boyfriend and a long history of depression as well as some history of bronchitis. She took sleeping pills to try to kill herself." (R. 314). Dr. Reitz also noted claimant's current medications, Paxil and Zythromax, and family history of depression. (*Id.*). He diagnosed claimant with bronchitis, bilateral knee contusions, depression and suicidal ideation. (R. 315). The following day, June 8, 2000, Dr. Fagerson dismissed Weiss from the program with a diagnosis of major depression. (R. 305).

On June 9, 2000, Dr. Fagerson developed a treatment plan of "PHP, OPT ECT." (R. 321). Also on that date, Dr. Fagerson ordered claimant to attend five adult weekly therapy sessions at Alexian on an inpatient basis. (R. 319). Specifically, the doctor recommended that claimant attend individual therapy, group therapy, expressive

9

therapy, medication education, educational groups, nutritional education group, family therapy and family group each Monday through Friday. (*Id.*). On June 15, 2000, and during the course of the aforementioned therapy program, claimant began receiving "outpatient ECT services" at Alexian. (R. 322). The record does not indicate the frequency or length of those services, but only states that Weiss was "to receive right unilateral treatments until discontinued." (*Id.*). Weiss was discharged from the adult weekly therapy program on July 6, 2000 with instructions to "see Dr. Jandra Vrela for therapy & Dr. Fagerson for med mana[gemen]t." (R. 316-17). Claimant reported that the "ECT has helped" and "she cannot benefit from groups anymore and felt ready for discharge." (R. 320). At that time, claimant was not taking any prescription medication. (R. 317).

On November 12, 2001, Leonard Sherman, M.D. ("Dr. Sherman") reviewed a CT scan of claimant's head, performed with and without contrast. (R. 427). Dr. Sherman found "no evidence of acute hemorrhage or mass effect." (*Id.*). He noted that claimant's extra axial spaces and paranasal sinuses were clear and opined that the CT scan was "unremarkable." (*Id.*).

Dr. Fagerson examined claimant on March 12, 2002. (R. 334-38). He found no neurological, musculoskeletel, endocrine, or hematopoietic problems, but noted claimant's "disturbances in mood (including depression)." (R. 336). In a May 3, 2002 update to that exam, Dr. Fagerson noted claimant's report of "migraines 2X per month." (R. 334). The record includes a patient history related to claimant's March 13, 2002 admission for "ECT, depressed mood . . . migraine headaches." (R. 333). Also included in the record is a progress note dated October 21, 2002. (R. 330-31). In that

10

note, an unidentified nurse reported claimant's admission date of June 16, 2000 and discharge date of October 21, 2002 for "ECT's." (R. 330).

Weiss returned to Alexian on November 22, 2002 because she had "given up on everything." (R. 325-28). Claimant reported that she had been pregnant and lost the baby, and was "taking anger [out] on boyfriend - now he is leaving." (R. 325). She had "started to drink bleach" and felt that she was "hurting everyone around her." (*Id.*). Weiss stated that she had "no self esteem, no energy to look for work." (*Id.*). She had stopped taking Zoloft four days prior, and rated her depression at "8+." (*Id.*). Martin May ("Mr. May"), a licensed clinical social worker, completed claimant's intake screening form and noted that Weiss had "outpatient ECT this year, stopped 8/02." (*Id.*). Claimant reported three prior suicide attempts, including the aforementioned attempt with bleach. (R. 327). Weiss felt that she was "still suicidal and unable to control for safety." (R. 328). Claimant reported that she had been raped at age twenty. (R. 326). Weiss also stated that she had used marijuana and alcohol since age seventeen. (*Id.*). She last used marijuana on that day, and typically used "3-4 bowls" "daily." (*Id.*). Mr. May diagnosed claimant with "major depression, severe, recurrent" and assigned a current Axis V Global Assessment of Functioning ("GAF") score of 15. (R. 328). After consulting with Dr. Fagerson, he transferred claimant to Glen Oaks. (*Id.*). Claimant received treatment through the behavioral health services unit at Glen Oaks from November 23, 2002 through November 25, 2002. (R. 342-416).

On December 6, 2002, a clinician at Kenneth Young Centers ("Kenneth Young") performed a mental health assessment of Weiss. (R. 514-16). Claimant reported "symptoms of depression that include sad mood, irritability, past suicide ideation and

11

attempt, low energy, and low self-esteem," that can fluctuate and "usually increase during the wintertime." (R. 514). She also reported "symptoms of mania that include inflated self-esteem, racing thoughts, talkative, driven to get multiple tasks done, and increase in spending money" that appear more often then her depressive symptoms. (*Id.*). Claimant stated that she was in a "slump" due to a recent miscarriage and had been coping by smoking marijuana. (*Id.*). Claimant requested "ongoing mental health treatment for her depression." (*Id.*). Weiss also reported that she previously received treatment at Alexian, "but stopped due to not being able to pay for services." (*Id.*). During her prior treatment, claimant agreed to ECT. (R. 515). Weiss had a total of 20 ECT sessions, the last in August 2002. (*Id.*). According to the claimant, "initially the ECT worked, but now [she] is not so sure it continues to work." (*Id.*). The clinician completing the assessment diagnosed Weiss with "bipolar disorder - most recent episode depressed" and cannabis abuse, and recommend therapy and "case management services to aid her in exploring other ways to support herself once the trust fund runs out." (R. 516).

Claimant met with Elizabeth Rieger, LCSW/MSW ("Ms. Rieger") for individual therapy on December 12, 2002. (R. 512). In that meeting, claimant identified a "few goals . . . including getting a job, sticking with a treatment program (i.e., coming to [Kenneth Young] consistently), realizing what triggers for depression and mania are, and increasing structure to her daily routine." (*Id.*). Ms. Rieger noted that Weiss "appeared anxious in mood and affect, actively participated in development of a treatment plan, [and] continues to appear motivated for treatment." (*Id.*).

On December 26, 2002, claimant received a prescription for Lithobid. (R. 511).

12

Also on that date, Herbert M. Forman, M.D. ("Dr. Forman"), a psychiatrist at Kenneth Young, evaluated claimant. (R. 517-19). Weiss reported mood swings, depression, low self esteem and past suicidal thoughts. (R. 517). Dr. Forman noted that claimant was alert, oriented and appropriately dressed with "judgment intact." (R. 518). He diagnosed "bipolar disorder, most recent episode depressed," and assigned a current GAF score of 52. (R. 519).

Claimant returned to Kenneth Young on December 31, 2002 and reported that "ever since she started taking the Lithium she has been very tired." (R. 510). On January 24, 2003, claimant informed Ms. Rieger that she was "trying to remain positive" and making an effort to get a job. (R. 509). She described her mood as "more balanced" over the past month. (*Id.*). Four days later, on January 28, 2003, Dr. Forman saw claimant for medication monitoring and opined that she had "really improved." (R. 508). At that time, claimant's mood swings were gone and she felt "on an even keel, little things do not throw her off at all." (*Id.*). Weiss stated that she was "[a]t first tired, but now not at all on the lithium carbonate," and the "usual side effects . . . are tolerable." (*Id.*). Dr. Forman refilled claimant's prescription for Zoloft. (R. 496). He further noted claimant had "no headaches (the ones she had before have gone, but this may be that the ECT had caused the migraines and now off maintenance ECT she is not having them.)." (R. 508).

On May 28, 2003, claimant updated her therapist, Ms. Rieger, on the "last couple of months." (R. 506). Weiss had "been working and had a daily structure" which "helped a lot with balancing her mood." (*Id.*). She stated that she had "broken up with her boyfriend which she initiated," "has been going out with friends and keeping busy,"

13

and "has been going to the tanning booth every other day for 10 minutes each time . . . [and] believes this is also helping her not get depressed." (*Id.*).

Claimant returned to Dr. Forman's office on June 11, 2003, and reported that she had "basically been stable on current medication." (R. 505). Dr. Forman noted that claimant "kept forgetting AM Lithobid, as it turns out she had done well with just one at night, no significant mood swings. No side effects at this time. Mood euthymic." (*Id.*). He refilled claimant's prescriptions for Lithobid and Zoloft, and prescribed 10 mg of Ambien at bedtime. (R. 496). Another physician at Kenneth Young refilled claimant's Lithobid, Zoloft and Ambien on August 28, 2003. (*Id.*). On September 10, 2003, Weiss informed Dr. Forman that "the combination of Lithobid 300mg/day [and] Zoloft 100 mg has been very helpful." (R. 504). Claimant also stated that she had more energy, "sleeps better" and was looking for a job. (*Id.*). Dr. Forman noted that there were no side effects from claimant's medication. (*Id.*).

On November 6, 2003, claimant presented to the emergency room at Northwest Community Hospital seeking treatment for a migraine headache. (R. 439-43). Weiss reported that the migraine began two days prior, and that she has suffered from migraines since receiving ECT therapy two years ago. (R. 442). Betty Van Leuven, M.D. ("Dr. Van Leuven") noted that a CT scan of Weiss's head was negative. (R. 443). Six days later, on November 12, 2003, Weiss informed Dr. Forman that she had "a full time job which she like[d]." (R. 503). The doctor noted that claimant's "affect was brighter," and she "doesn't want to see a counselor." (*Id.*).

Claimant's medical records also include discharge instructions and related records from claimant's November 14, 2003 visit to Alexian. (R. 418-26). On that date,

14

claimant arrived in the emergency room complaining of a "headache whil[e] drying her hair . . . light bothering her." (R. 418). The emergency room physician found that claimant's head and neurological functioning were "normal" and diagnosed a migraine headache. (R. 419). The doctor ordered 25 mg of Phenergan and 30 mg of Toradol and subsequently discharged Weiss in stable condition. (R. 420).

According to a medication log, Jerry Gibbons, M.D. ("Dr. Gibbons"), a psychiatrist at Kenneth Young, refilled claimant's prescriptions for Lithobid and Zoloft on February 23, 2004. (R. 603). Claimant underwent a "normal" MRI scan of her brain on May 7, 2004. (R. 702). Dr. Gibbons added Depakote ER to claimant's medication regime on May 20, 2004, and refilled claimant's prescriptions for Depakote ER and Zoloft on July 1, 2004, and July 9, 2004. (R. 603). Claimant sought treatment at St. Alexius Medical Center ("Alexius") for burning and painful urination on July 17, 2004. (R. 680-701). She was prescribed various antibiotics, including Levaquin and Doxycyline. (R. 693-94). Claimant received refills of Depakote ER and Zoloft on August 27, 2004 and November 5, 2004. (R. 603).

On September 23, 2004, William N. Hilger, Ph.D. ("Dr. Hilger"), a registered clinical psychologist and state consultative examiner, performed psychological testing for the Bureau of Disability Determination Services ("DDS"). (R. 471-74). Weiss informed Dr. Hilger that she had applied for disability benefits for bipolar disorder "since she was a child" and migraine headaches "since she was 19 years old" which she had attempted to control with sixteen different medications. (R. 471). At that time, claimant lived in a two-bedroom home with two dogs and two cats. (R. 472). She did "regular housework" and "very little cooking . . . since she tends to be lazy but does know how to

15

cook." (*Id.*). Claimant described her mood as "generally fair and even-keeled with her medication, which control[s] the mood swings," and stated that she 'feels very sleepy and tired most of the time." (*Id.*). Dr. Hilger diagnosed Weiss with bipolar disorder "more depressed type, fairly controlled with medication," ongoing cannabis abuse, and "average intellectual functioning." (R. 474). He concluded that claimant "has fair mental potential as long as she continues receiving psychiatric treatment and takes her medications faithfully to perform work related activities." (*Id.*). Dr. Hilger also found Weiss "mentally capable of properly managing any benefit payments on her own behalf if she does not continue using marijuana and other drugs." (*Id.*).

DDS consultant Donald E. Henson, Ph.D. ("Dr. Henson") completed a Residual Functional Capacity ("RFC") assessment of claimant's mental functions on October 24, 2004. (R. 475-78). Dr. Henson determined that claimant's capacity for understanding and memory, as well as her ability to adapt to changes in the work setting, were not significantly limited. (R. 475-76). He found claimant's abilities to carry out detailed instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms were moderately limited. (*Id.*). Dr. Henson also concluded that claimant had no significant limitations in her ability to ask simple questions, request assistance, accept instructions, and maintain socially appropriate behavior. (R. 476). The doctor found moderate limitations in Weiss's ability to interact appropriately with the general public and get along with coworkers. (R. 476). He opined that claimant was "capable of simple routine activities," and noted that "there would be some difficulty with complex/technical activities." (R. 477). Finally, Dr.

16

Henson noted that claimant "performs a wide range of chores and leisure activities." (*Id.*).

In connection with the RFC assessment, Dr. Henson completed a psychiatric review technique form. (R. 479-92). Dr. Henson found that claimant suffered from affective disorder under listing 12.04 in the form of a depressive syndrome characterized by sleep disturbance, psychomotor agitation or retardation, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 482). He also noted a substance addiction disorder under listing 12.09. (R. 487). The doctor concluded that, as a result of these mental disorders, claimant had "moderate" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence or pace. (R. 489). Dr. Henson found that the medical evidence did not establish the presence of the "C" criteria for the 12.04 (affective) listing. (R. 490).

On December 9, 2004, claimant sought treatment from Dan Cacioppo, M.D. ("Dr. Cacioppo") at Suburban Neurologists, S.C. for "[m]igraines for four years." (R. 538-39). The doctor noted that Weiss "has been diagnosed with migraine without aura over the last four years, getting two to six per month," and that "MRI and laboratories are negative." (R. 538). She further described her symptoms as "migrainous with nausea, minimal vomiting, light sensitivity and being physically disabled by the headache." (*Id.*). Claimant's medication regime consisted of Zoloft and Depakote "which has decreased the frequency of her headaches." (*Id.*). Dr. Cacioppo's neurological examination included claimant's mental status, cranial nerves, and cerebellar, and was "normal." (R. 538-39). He recommended B2 and magnesium as

preventive medication, a trial of Topamax, and Novatriptan. (R. 539).

Weiss returned to Dr. Cacioppo for follow up care on February 3, 2005 and reported that she was "headache-free now on Topamax 100 mg at night and is tolerating it well." (R. 540). Dr. Cacioppo concluded that claimant's "headaches are resolved," and recommended that she call if her headaches break through, and otherwise follow up in three to four months. (*Id.*).

Weiss arrived at the Alexian emergency room via ambulance on March 24, 2005 complaining of traumatic shoulder pain. (R. 625-33). Claimant returned to the emergency room on October 24, 2005. (R. 634-42). She complained of a migraine that began that morning, photophobia, and blurred vision, and denied double vision or any recent trauma. (R. 634). Weiss described her headache as sharp and stabbing, with a pain level of "10/10." (R. 635). According to the nursing notes, claimant did not obtain any relief from Benadryl and Motrin and reported that she "normally needs Dilaudid to relieve pain." (R. 636). Weiss received Benadryl, Regian and Toradol through a slow IV push, and felt "much better post medications, now pain [o]f 4/10." (R. 637-38). The attending physician discharged claimant in stable condition and ordered her to follow up with her doctor. (R. 639). On January 7, 2006, Weiss sought treatment at Alexian for a headache that had lasted approximately a week. (R. 643-49). A CT of claimant's head revealed no intracranial hemorrhage, midline shift, mass effect, hydrocephalus or fracture. (R. 646). The attending physician prescribed Vicodin 7.5 mg for pain. (R. 648).

Claimant sought treatment from Dr. Gibbons on October 30, 2006 and requested that he complete certain forms related to her request for disability insurance benefits.

(R. 622).  Dr. Gibbons' treatment note indicated that he "[t]old pt. [he] did not believe [his] comments would help her much because she has been stable psychiatrically for a long time." (*Id.*).  On November 4, 2006, Dr. Gibbons completed the requested Psychological/Psychiatric Impairment Report.  (R. 607-14).  He noted claimant's diagnosis of bipolar disease not otherwise specified first made on February 3, 2003.  (R. 607).  The doctor also indicated that the onset date of claimant's condition was "unknown" and she had not undergone any psychological testing.  (*Id.*).  Dr. Gibbons identified claimant's recurring clinical manifestations as memory impairment and mood disturbance, specifically decreased energy and difficulty concentrating.  (R. 608-09).  When asked if claimant was able to work in a non-sheltered work setting, Dr. Gibbons checked yes and further explained that "Weiss has been babysitting . . . she would have trouble in more stressful demanding positions esp. requiring public contact."  (R. 613).  He opined that claimant's illness limited her ability to "deal with the public" and "stress can leap to irritability."  (R. 611).  He stated that "according to patient, she lacks motivating [and] becomes easily frustrated."  (*Id.*).  Dr. Gibbons also noted that, to his knowledge, claimant "has not had significant depression or manic" episodes since he began treating her in February 2004.  (R. 614).  He opined that her "response [was] good, prognosis fair to good."  (*Id.*).

Also on that date, Dr. Gibbons completed a medical source statement.  (R. 615-17).  In that statement, Dr. Gibbons opined that Weiss had a "good" ability to make occupational adjustments, follow work rules, relate to co-workers, use judgment with the public, interact with supervisors, function independently, and remember and carry out detailed (but not complex) job instructions.  (R. 615-16).  He concluded that claimant

19

had a "fair" ability to deal with public, deal with work stresses, and maintain concentration. (R. 615). Dr. Gibbons also opined that Weiss had a "good" ability to make personal-social adjustments, maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations, but only a "fair" ability to demonstrate reliability. (R. 616). Finally, Dr. Gibbons opined that Weiss's headaches "may limit reliability [and] regular attendance." (*Id.*).

Claimant received treatment from Dr. Cacioppo on November 28, 2005. (R. 541). At that time, claimant reported "that her Topamax has stopped working," and she is "desperate for pain control." (*Id.*). Dr. Cacioppo stopped the Topamax, and recommended a trial of "DHE nasal spray." (*Id.*). He noted that claimant was also taking "Zoloft and Depakote from her psychiatrist." (*Id.*).

Claimant sought treatment from Dr. Gibbons on January 1, 2006 and reported that she "stopped taking Depakote based on recommendation of [a] neurologist in 11/2005 because it was no longer controlling migraines." (R. 598). Claimant stated that she was "working for father part time" and "[w]ants to go to school to get Fire Science Degree which would help her get [a] job with Fire Dept." (*Id.*). On May 23, 2006, Dr. Gibbons noted claimant's current medications of "Imitrex injections pm, Benadryl (which helps with her migraines at times)," and Zoloft. (R. 597). Claimant returned to Dr. Gibbons on August 8, 2006 and reported that "her migraines have been bad recently. Imitrex is not working as it had in past." (R. 596).

### D. Medical Experts' Testimony

Kathleen O'Brien, a licensed clinical psychologist ("ME O'Brien"), testified as a medical expert at claimant's hearing. (R. 81-88, 94). After reviewing claimant's medical

record, ME O'Brien did not find any significant conflicts or deficiencies in the record itself.  (R. 81-82).  However, the ME did note several unexplained gaps in claimant's treatment records during the years 2000 through 2003.  (R. 82).

The ME observed that, based on her testimony, Weiss "doesn't believe that her mental health symptoms would interfere with her ability to work."  (R. 83).  ME O'Brien opined that this is "quite consistent with all the records" from Kenneth Young which "continue to report that her mental status is quite acceptable."  (R. 83-84).

ME O'Brien observed that claimant's treatment records indicate that she "was a fairly [regular] user" of marijuana, and her marijuana use "very much predates the initiation of the headaches."  (R. 84).   The ME opined that claimant's marijuana and alcohol use "explains some of the volatility of her behavior down through those early years, 1999 to 2002, 2003."  (*Id.*).   She later explained that marijuana is a "hallucinogen and when people take mind altering medications that create hallucinations they can have some very frightening and powerful experiences which lead to all sorts of acting out behaviors."  (R. 86).  ME O'Brien noted that "nothing in the record . . . indicates [claimant] was violent."  (R. 87).

The ME observed that when hospitalized, claimant "would refuse counseling" and "say she didn't want to be in a group," and would be sent home on medication.  (R. 84).  ME O'Brien speculated that this may be why "eventually . . . they decided to try the ECT to see if that would help."  (*Id.*).  According to ME O'Brien, ECT "can have side [e]ffects but they tend to be immediate."  (R. 85).  She stated that immediately after treatment patients often report headaches, memory loss or lethargy, "[b]ut over a period of weeks that completely dissipates."  (*Id.*).  ME O'Brien "typically" doesn't see "long term [e]ffects

21

from [ECT] physically." (*Id.*). She found no relationship between claimant's headaches and her psychiatric problems, and could not identify any "triggers" for the headaches. (R. 87). ME O'Brien explained that claimant described "physical headaches that . . . don't follow any particular pattern of the symptomatology of a mood disorder." (*Id.*). The ME also noted that claimant presented with a "specific symptomatology" that doesn't "necessarily relate in anyway to a psychiatric illness." (*Id.*).

ME O'Brien found that claimant "did appear to have met [the] criteria of a listing back in the year 2000 to, say, 2002 and they wouldn't at that time have described it as bipolar although now they describe it more as bipolar." (R. 85). ME O'Brien stated that claimant's condition would have been "considered . . . depression because she was having the suicidal ideation." (*Id.*). The ME opined that claimant's condition was "seriously complicated" by her marijuana use, which accounted for "the bad judgment, the impulsivity, the outbursts towards mother and so forth." (*Id.*). She noted that claimant's therapists continue to give her medication and to report that Weiss's mental status was "quite acceptable." (R. 84). Thus, ME O'Brien opined that "at this time" claimant "doesn't meet any listing as far as mental health is concerned." (R. 84). The ME did not find any mental restrictions on claimant's functional abilities. (R. 94).

Walter J. Miller, M.D. ("ME Miller"), a board-certified surgeon, also testified as a medical expert. (R. 77-81, 94). ME Miller stated that, after reviewing the entire record, he could not find "any particular organic cause for [claimant's] headaches in the sense of [an] elusion or brain tumor." (R. 80). The ME noted that claimant "had negative MRI tests." (*Id.*). Further, Weiss had "been to a lot of emergency rooms and then she's had a lot of heavy medication," and it "doesn't appear that this has worked." (*Id.*). ME Miller

had no basis to determine if claimant "has anything that actually meets a listing on the basis of a[n] organic headache syndrome." (*Id.*). He further noted that it seemed Weiss's "headaches are based on a psychological or psychosomatic or some kind of a mental basis." (R. 80). ME Miller concluded that claimant did not have any physical restrictions. (R. 94).

### E. Vocational Expert's Testimony

William Schwiehs ("VE Schwiehs") testified as a vocational expert before ALJ Greene. (R. 56-57, 89-95). VE Schwiehs opined that claimant's past work "all seems to be of unskilled nature or low end of semi-skilled." (R. 93). The VE found that there were "special considerations" related to the work claimant performed for her stepfather, but he could not "comment on that." (R. 94). VE Schwiehs also noted that many of claimant's past jobs only lasted for a month or two. (R. 93).

The VE opined that with "full credibility" of claimant's testimony regarding "migraines of a severe nature occurring two to three times a week[,] six to sixteen hours a day," she would be unable to do any work in the national economy. (R. 95). The ALJ did not solicit the VE's testimony regarding claimant's ability to perform her past jobs, or ask if a hypothetical person without any restrictions could perform any work in the national economy.

## III. LEGAL STANDARD

### A. Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d

936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). Rather, this Court will "conduct a critical review of the evidence" and not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence and to enable us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curium) (quotations omitted).

### B.    Analysis Under the Social Security Act

In order to qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is

24

disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Greene followed this five-step analysis. (R. 20-28). At step one, the ALJ found that claimant had not engaged in any substantial gainful activity since January 1, 1999, the alleged onset date. (R. 22). ALJ Greene found, at step two, that claimant had severe impairments of "an affective disorder, a polysubstance use disorder, and migraine headaches." (*Id.*). The ALJ then determined, at step three, that claimant did not have any impairment or combination of impairments that met or equaled any listing and would render her automatically disabled under the Act. (*Id.*). ALJ Green found claimant's testimony regarding the intensity, persistence and limiting effects of her symptoms was "not entirely credible." (R. 24). Further, the ALJ found that claimant had the RFC to perform "unskilled work involving simple routine tasks at all exertional levels, and which involves only occasional contact with the general public." (R. 23). At step four, ALJ Greene concluded that claimant had no past relevant work or transferable skills. (R. 27). However, he found, at step five, that claimant could perform a

significant number of jobs in the national economy. (R. 27-28). Therefore, the ALJ determined that Weiss had not been under a disability, as defined in the Act, from January 1, 1999 through February 14, 2007, the date of his decision. (R. 28).

Weiss challenges the ALJ's determination that she is not disabled. Claimant argues that ALJ Greene erred at step three by failing to give appropriate weight to medical evidence regarding her migraine headaches. Weiss also contends the ALJ's credibility determination is "not supported by substantial evidence and contains errors of law." Next, Weiss claims that the ALJ did not consider the impact of her migraine headaches in connection with his RFC determination. Finally, claimant argues that the ALJ's step five conclusion is not supported by "any evidence" and "incorrect as a matter of law." We begin with Weiss's contentions relating to the ALJ's consideration of migraine headaches.

## IV. THE ALJ CONSIDERED CLAIMANT'S MIGRAINE HEADACHES

"Although claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citation omitted). Here, claimant argues that reversal is warranted because "the ALJ improperly ignored an entire line of evidence with respect to the migraine headaches in this case." To support this contention, claimant cites records of various hospital visits due to migraine headaches between November 14, 2003 through May 30, 2006, as well as the Seventh Circuit's holding in *Golembiewski v. Barnhart*, 322 F.2d 912 (7th Cir. 2003). (R. 624-54). We find that neither citation supports claimant's request for an outright award of benefits, or requires that we remand this case for reconsideration of the ALJ's finding at step three.

26

The aforementioned hospital records relate to Weiss's treatment after June 30, 2003. Because claimant's status as an insured expired on June 30, 2003, "in order to recover benefits, she must establish that she was disabled as of that date." *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (citations omitted); *see also Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005) (holding that the ALJ did not err in denying an application for disability insurance benefits where the claimant did not offer evidence to show that she was disabled during the insured period). Moreover, the records claimant relies on do not include medical opinions that contradict the ALJ's conclusions. *See, e.g. Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (explaining that the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected.") (citation omitted). Claimant's reliance on *Golembiewski* is equally misplaced. In that case, the Seventh Circuit found that the ALJ erred by characterizing an MRI as showing "no herniations" when claimant's physician stated that the MRI showed "lumbosacral herniation," and by failing to discuss claimant's bowel and bladder dysfunction. 322 F.2d at 917. No such facts are present here. Nevertheless, we will consider claimant's contention that ALJ Greene's "failure to conduct a more thorough analysis of the migraines at step three requires remand."

ALJ Green reviewed the evidence related to claimant's migraine headaches, as well as her other allegedly disabling impairments. The ALJ noted that Weiss "has complained of migraine headaches, prompting emergency room visits and diagnostic testing, which failed to reveal any cerebral pathology." (R. 26). This summary is consistent with claimant's medical records which ALJ relied on in reaching this conclusion. For example, claimant underwent a CT scan of her head on January 17,

2006 which, according to the reviewing radiologist, revealed "no intracranial acute abnormality." (R. 647). Similarly, claimant's November 12, 2001 and November 6, 2003 CT scans were deemed "unremarkable" and "negative." (R. 427, 443). The ALJ also noted that claimant had a neurologic consultation for migraine headaches in December 2004, and "chose to ignore" Dr. Cacioppo's treatment recommendation that she stop smoking and drinking. (R. 26). He also recognized Dr. Forman's January 2003 finding that claimant had "no headaches," and that her prior headaches "have gone" which "may be that the ECT had caused the migraines and now off maintenance ECT she is not having them." (R. 25, 508). Where, as here, an ALJ's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," it must be affirmed even if an alternative position is also supported by substantial evidence. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

Claimant also challenges ALJ Greene's failure to make an explicit finding as to the cause of her headaches, as well as his reliance on ME O'Brien's testimony regarding the lack of connection between claimant's headaches and her psychiatric treatment. (R. 26). However, claimant does not point to any specific opinion in the record that identifies the underlying etiology for her headaches. The Seventh Circuit has cautioned that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt. v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). Accordingly, we will not remand on this basis. *See id.; Goodson v. Barnhart*, 217 F. Supp. 2d 892, 900-01 (N.D. Ill. 2002) (remanding where the ALJ succumbed to the temptation to play doctor and made independent medical findings). For this same reason, we are not persuaded that ALJ

28

Greene erred by failing to resolve a perceived conflict between the opinions of ME Miller and ME O'Brien. ME Miller testified that, based on his review of the evidence, claimant's headaches were not the result of a brain tumor or other organic cause. (R. 80). He noted that it seemed claimant's headaches had "some kind of mental basis," but declined to offer an opinion on that issue. (*Id.*). ME O'Brien opined that claimant's headaches "don't follow any particular pattern of the symptomatology of a mood disorder" and are not "necessarily related in anyway to a psychiatric illness." (R. 87). There is no obvious conflict between these opinions, and the ALJ did not err by relying on the testimony of the medical experts. *Cf. Scott v. Barnhart,* 297 F.3d 589, 596 (7th Cir. 2002) (remanding and instructing the ALJ to analyze the medical evidence, including three different diagnoses, rather than generally conclude that the claimant has impairments with some linguistic and cognitive delays).

## V. THE ALJ'S CREDIBILITY DETERMINATION IS NOT PATENTLY WRONG

Under the governing regulations, the ALJ was required to evaluate the intensity and persistence of claimant's symptoms, including pain, in connection with "all of the available evidence, including [her] medical history, the medical signs and laboratory findings and statements," and then "determine the extent to which [her] alleged functional limitations and restrictions due to pain or other symptoms [could] reasonably be accepted as consistent" with that evidence. 20 C.F.R. § 404.1529(a); *see also* Social Security Ruling ("S.S.R.") 96-7p (An ALJ's "assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his ability to function must be based on a consideration of all the evidence in the case record."); *Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007)

(relying on S.S.R. 96-7p). Following this two-step process, ALJ Greene found that "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible." (R. 24).

"Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted). Thus, this Court will reverse ALJ Greene's credibility finding only if it is "patently wrong." *Id.* Here, Weiss contends that ALJ Greene's determination must be reversed because he impermissibly relied on claimant's "poor choices and lifestyle" in finding that her pain complaints were not fully credible. Claimant further argues that the ALJ "failed to consider her subjective complaints of pain despite the fact that a medically determinable impairment of migraine headaches exists which even the ALJ acknowledges." *See Indoranto*, 374 F.3d at 474 (reasoning that the ALJ "must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain.") (citations omitted).

The ALJ considered claimant's report of "depression, anxiety, migraines, blurry vision and troublesome medication side effects," and testimony that the "severe and frequent headaches are her most debilitating problem." (R. 24). However, ALJ Greene found that the "extent of [Weiss's] daily activities since January of 1999 belie her allegations." (R. 26). In connection with this determination, the ALJ reviewed relevant evidence in the case record, including claimant's medical records and statements to her

treating physicians.  (R. 24-27).  Among other things, the ALJ cited claimant's reports of performing light cooking and housework and her ability to care for several pet dogs and cats and baby-sit.  (R. 26).  He also noted that claimant's earnings after her alleged onset date were higher than those before her alleged onset, suggesting that "claimant's lifestyle appears to be of her own choice, and not secondary to severe disabling impairments."  (*Id.*).  Because the ALJ's determination was "reasoned and supported," we cannot find it patently wrong.  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *see also Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003) (where credibility finding had adequate support in the record, claimant could not demonstrate that it was patently wrong).

## VI.  THE ALJ'S RFC DETERMINATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Weiss argues that ALJ Greene erroneously determined that she has the residual functional capacity to perform unskilled work involving simple routine tasks.  Specifically, claimant contends that the ALJ failed to take into account the limiting effects of her migraine headaches, that the ALJ's RFC is not supported by substantial evidence, and that the RFC is "illogical because the limitation to simple routine tasks is, in fact, no limitation."

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  S.S.R. 96-8p.  Where, as here, a claimant has more than one impairment, the ALJ must consider all of the medically determinable impairments,

including those which are not severe, in connection with the RFC determination.  20

C.F.R. § 404.1545(a)(2).  The ALJ must evaluate the "intensity, persistence, and

functionally limiting effects of [claimant's] symptoms" in order to determine if those

symptoms "affect the individual's ability to do basic work activities."  *Schneck v.*

*Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (quoting S.S.R. 96-7p).  An ALJ's RFC

assessment must be based on the relevant evidence in the record, including, among

other things, claimant's medical history, medical signs and findings, effects of treatment,

and reports of daily activities.  S.S.R. 96-8p.

Weiss argues that ALJ Greene's RFC finding is "illogical" because 20 C.F.R. §

404.1521 "specifically provides that an impairment is not severe if it does not

significantly limit physical or mental ability to do basic work activities which by definition

includes understanding, carrying out and remembering simple instructions and dealing

with changes in a routine work setting."  Thus, claimant contends that ALJ Greene's

determination, at step two, that she suffered from severe impairments of an affective

disorder, polysubstance use disorder and migraine headaches, required the ALJ to also

find that those impairments significantly limited or precluded basic work activity.  No

such requirement is imposed under the governing regulations.

Weiss contends that the ALJ did not consider the limiting effects of her

migraines.  We disagree.  As discussed above, the ALJ considered the medical

evidence related to claimant's headaches.  He then found that the headaches did not

prevent claimant from performing a variety of daily activities, or from spending a

summer working in a restaurant.  (R. 26).  This conclusion, as well as the remainder of

the ALJ's RFC analysis, is consistent with the objective medical evidence.  As the ALJ

noted, ME Miller and ME O'Brien both testified that the record failed to show any physically or mentally limiting conditions. (R. 26-27). In his October 24, 2004 RFC analysis, Dr. Henson found that a number of claimant's functional abilities were "moderately limited." (R. 475-76). However, Dr. Henson determined that claimant performed a "wide range of chores and leisure activities with sufficient cognitive and attentional ability to perform at least simple routine activities which have few social demands." (R. 477). Dr. Gibbons also opined that even though claimant experienced difficulties interacting with the public, she could work in a "non-sheltered environment." (R. 27, 613). Because the restrictions found by claimant's treating physician and the ME's are consistent with the ALJ's RFC determination, we cannot find that remand is warranted. *See, e.g. Ulloa v. Astrue*, 611 F. Supp. 2d 796, 808 (N.D. Ill. 2009) (affirming the ALJ's determination where the medical evidence, examined in its entirety, revealed a common finding among the treating doctors that claimant could perform sedentary work).

## VII. THE ALJ APPLIED THE APPROPRIATE GRID FRAMEWORK AT STEP FIVE

Finally, claimant challenges ALJ Greene's determination that she can perform jobs that exist in significant numbers in the national economy. The Commissioner bears the burden to show, at step five, that claimant's RFC allows her to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566. The Commissioner may meet this burden by relying upon the VE's testimony, or by showing that claimant's residual functional capacity, age, education, and work experience coincide with a rule in the Medical-Vocational Guidelines (the "grids"). 20 C.F.R. Pt. 404, Subpt. P, App. 2. If the ALJ correctly relies on the grids,

vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). Here, claimant argues that ALJ Greene erred by applying the "grid rules as if the non-exertional impairment of limited contact with the general public did not exist." Weiss further contends that the ALJ's step five determination cannot stand because he did not elicit any testimony from the VE regarding the availability of jobs for a person with claimant's RFC.

The guidelines prescribe that "[t]he determination as to whether disability exists will be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in appendix 2." 20 C.F.R. § 404.1560(c)(2); *see also* 20 C.F.R. § 404.1569 (explaining that the grids are based on the Dictionary of Occupational Titles classifications that reflect major functional and vocational patterns). In *Hayes v. Barnhart*, the case claimant relies on to support the alleged error regarding the application of the grids, the Seventh Circuit explained that where an RFC finding does not "exactly coincide" with a grid, the ALJ is required to use the grids as a "framework" but "otherwise must reach a conclusion based on the factors and principles set forth in the regulations," *Hayes*, 416 F.3d 621, 629 (7th Cir. 2005) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2)).

ALJ Greene found that claimant Weiss had the RFC to "perform unskilled work involving simple routine tasks at all exertional levels, and which involves only occasional contact with the general public." (R. 23). Because he found a nonexertional limitation - only occasional contact with the general public - the ALJ's finding did not exactly coincide with a grid. *See id.; see also* 20 C.F.R. § 404.1569a(a) (stating that limitations or restrictions that affect a claimant's ability to meet the demands of jobs other than the

34

"strength demands, that is, demands other than sitting, standing, walking lifting, carrying, pushing or pulling," are considered nonexertional).  Accordingly, as prescribed under the regulations, the ALJ did not apply the grid itself, but rather the "framework of section 204.00," the applicable grid for individuals who maintain the capacity for heavy work, including work at the lesser functional levels.  (R. 28).  He also considered claimant's RFC and vocational factors of age, education and work experience.  (R. 23-28).  Because the ALJ's consideration of claimant's RFC is consistent with the governing regulations, we decline to remand on this basis.  20 C.F.R. §§ 404.1560(c), 404.1566.

Weiss further contends that the ALJ erred because he did not elicit any testimony from the VE regarding the existence of jobs for a person limited to occasional contact with the general public.  In oral arguments, the Commissioner conceded that this is an "arguable imperfection" in ALJ's Greene's decision, but argued that it does not justify reversal or remand.  The Commissioner also argued that a consideration of claimant's ability to perform skilled and semi-skilled work shows that she can perform a number of jobs in the national economy.  Because the ALJ limited claimant to unskilled work, we do not credit the latter argument.

A vocational expert is not required as part of a disability hearing, and the decision to employ the services of a vocational expert is entirely within the ALJ's discretion. *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994) (citing *Ehrhart v. Secretary of HHS*, 969 F.2d 534, 540 (7th Cir. 1992)).  However, "[w]here a nonexertional limitation might substantially reduce the range of work an individual can perform, use of the grids is inappropriate and the ALJ must consult a VE." *Fast v. Barnhart*, 397 F.3d 468, 470 (7th

Cir. 2005).  After carefully reviewing the record, this Court finds no basis to conclude

that the limitation of only occasional contact with the general public might "substantially

reduce the range of work" Weiss can perform.  ALJ Greene relied on the opinions of Dr.

Gibbons, claimant's treating psychiatrist who "noted some problems interacting with the

public, [but] believed that she could work in a non-sheltered environment."  (R. 27).

Common sense - and prior case law - establish the existence of a number of jobs that

require only limited public contact.  *See, e.g. Martin v. Astrue*, 2009 U.S. App. LEXIS

21075 (7th Cir. Sept. 23, 2009) (affirming denial of benefits where the VE testified that

an individual limited to simple routine tasks and no contact with the general public could

still perform a significant number of jobs in the regional economy); *Britton v. Astrue*, 521

F.3d 799, 802 (7th Cir. 2008) (recognizing that the "VE testified that adding a further

limitation restricting public contact and interaction with coworkers would eliminate only

the cashier, sales, and office jobs," and therefore a hypothetical individual could perform

a number of jobs).  We also note the absence of any evidence in the record showing

that the aforementioned limitation might substantially reduce the range of work Weiss

can perform.  Accordingly, while the VE would have been uniquely qualified to offer an

opinion regarding the availability of jobs in the national economy for an individual limited

to occasional contact with the general public, we do not find it necessary to remand so

that the ALJ may question the VE on that topic.  *See, e.g. Nelms v. Astrue*, 553 F.3d

1093, 1100 (7th Cir. 2009) (finding the ALJ's assumption that light work exists in the

national economy which does not present a threat of concentrated exposure to irritants

was "not so outlandish as to warrant reversal"); *Howell v. Sullivan*, 950 F.2d 343, 349

(7th Cir. 1991) (holding that the ALJ did not err in relying on a grid where he found

claimant's alcoholism, depression and pain were not so severe as to be disabling). As the Seventh Circuit has recognized, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted).


## VIII.    CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted. It is so ordered.

                        **ENTERED:**

                        _____
                        **MICHAEL T. MASON**
                        **United States Magistrate Judge**


**Dated: December 16, 2009**